# Exhibit D

Statement of Lisa Milstein
(State Post-Conviction Writ Exhibit C)

| STATE OF TEXAS | § |
| --- | --- |
| | § |
| COUNTY OF HARRIS | § |

## STATEMENT OF LISA MILSTEIN

BEFORE ME, the undersigned authority, personally appeared, LISA MILSTEIN, who, under oath, stated as follows:

My name is Lisa Milstein. I am an investigator/mitigation-specialist with my primary place of business being in Houston, Harris County, Texas. I am over 18 and competent to make this affidavit.

As stated above, I am an investigator/mitigation-specialist. I have worked as an investigator/mitigation specialist for 3 ½ years. I hold an associate's degree in mental health as well as a two-year study of social work towards a License in Social Work from Houston Community College. As part of my schooling for my license I interned for my last two semesters at the Texas Resource Center under a master social worker and was trained for the job, which I currently perform. A "mitigation specialist" specializes in investigations designed to uncover and develop evidence of the defendant's background, including his or her, childhood, social environment, brain or organic disorders, abuse, drug addictions, any other personal characteristics which can be used at trial to mitigate against a death sentence in favor of life imprisonment. The majority of my work has been in state-level post conviction writs of habeas corpus and I have investigated approximately 21 cases. I have also investigated cases at the trial level, including *State of Texas v. Herman Addison* in which the jury assessed a life sentence based upon the mitigation evidence presented at trial. Based upon my experience in investigating capital cases on habeas, the amount of time involved can reach up to between 100 to 200 hours, depending upon the complexity of the issues in the case, where the case is located (if out of state), and the number of witnesses to be interviewed.

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

1

The scope of an investigation often expands beyond its initial time and cost estimation as leads are exhausted or more fully investigated and developed and new areas of investigation arise. For this reason, it is difficult, if not impossible to accurately estimate the scope and cost of an investigation at the outset. In my experience, the average cost of an investigation has ranged from between approximately $5,000 to $10,000, excluding expenses such as airfare, lodging and car rental.

I.

I was retained by Alexander L. Calhoun, attorney at law, to investigate any factual claims for relief in the post-conviction writ of habeas corpus for *Ex parte Arthur Brown*. After consultation with Mr. Calhoun, we determined that there were areas in both the guilt-innocence and punishment phases of the case which required investigation. With regard to the investigation of the punishment phase, since there was little evidence of the defendant's personal characteristics or circumstances admitted during the punishment phase of trial, we determined that a portion of the investigation in this case should include whether there was any mitigating evidence in Applicant's background which was not presented at trial.

Because of the particular circumstances of the case, (Applicant and most of the witnesses were from Alabama), in order to adequately investigate much of the case, I was required to travel to Tuscaloosa, Alabama, to interview witnesses. It is my experience that in order to conduct an adequate investigation, interviews must be conducted in person, rather than over the telephone. At times, an investigator must review documents with the interviewee. In addition, the investigator may often visit locations with the interviewee. More importantly, the personal contact between an investigator and an interviewee is essential to establish a personal rapport and build a level of trust which cannot be had by simply speaking with someone over the telephone. There is a particular type of information, particular that information which is personal and perhaps embarrassing, which can only be obtained by a personal interview and which cannot be obtained over the phone. Therefore, the investigation in this case necessitated locating and interviewing people both in Houston, Texas and Tuscaloosa, Alabama, with the main part of the investigation occurring in Tuscaloosa. Along with the travel it is my experience that witnesses must be interviewed on more than one occasion. This is because with the information I am asking not everyone will be so forthcoming and tell me up front. Once speaking to other witnesses, it is sometimes necessary to return to a prior witness and ask them about the facts which

2

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

have just been learned. A concrete example in the Arthur Brown case, I learned that Applicant's mother was an abusive alcoholic from speaking to his siblings, after having spoken to the mother. It was only after I confronted the mother a second time that she admitted to drinking heavily.

Mr. Calhoun informed me that the Court of Criminal Appeals had allocated $2500.00 for the investigation. After my investigation in Houston[1] and Tuscaloosa, the total cost of the investigation was $ 2792.34. This sum includes the cost of round-trip airfare to Tuscaloosa, and three nights lodging and car rental. At Mr. Calhoun's request, I prepared a memorandum summarizing the facts, which I had determined, and the further areas that I believed required further investigation. I also estimated that the costs of further investigating this case to be approximately $2700.00. Mr. Calhoun later informed me that he submitted this memorandum to the Court of Criminal Appeals as part of a motion for additional funds to investigate this case, but that the Court denied the request. For this reason, I was unable to further investigate this case. It is my opinion, however, based upon the investigation already performed, that it was necessary to conduct further investigation in both Tuscaloosa, and in Houston.

II.

During my investigation in Tuscaloosa, Alabama, I met with several members of Applicant's family, including his mother, Joe Mae Brown, his father, Arthur Brown, Sr., his brother, Johnny Brown, and his sisters Grace and Serisa Brown, and Carolyn Momoh. The purpose of my meeting with these people was to investigate any facts relating to the guilt-innocence portion of trial which might not be evident in the trial the trial record (all three testified at trial during guilt-innocence), as well as to investigate and develop any possible mitigating circumstances in Applicant's background which existed at the time of trial but were not presented. The following is a summary of the information which I learned from the witnesses in Tuscaloosa:

---

[1] The initial investigation in Houston comprised locating and interviewing the surviving eye-witnesses to the offense, Rachel Tovar and Nicholas Cortez, a.k.a Alexander Camarillo. I was unable to locate Cortez/Camarillo because he is apparently an illegal immigrant using a false identity and documentation.

3

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

## A.

### Joe Mae Brown

Joe Mae Brown (hereinafter "Joe Mae") is Applicant's mother. She was contacted by Applicant's lead trial attorney, Ms. Patricia Saum, (hereinafter "Saum") prior to trial, but Joe Mae told me that Saum did not inquire into Applicant's background during their visit.

Joe Mae informed me that she was married to Applicant's father, Arthur Brown, Sr. until they divorced when Applicant was 12 years old. Joe Mae and her husband would fight during their marriage and one reason for their separation and divorce was because Arthur Brown, Sr. would beat her up. On a few occasions he would beat her with a leather belt.

Applicant was very unhappy about the divorce. Joe Mae started having trouble with Applicant after the divorce. On one occasion, she was contacted by the school and informed that Applicant was about to jump out of a window. She does not remember why Applicant wanted to do that.

Applicant received a head injury when he was 3 years old. Two older children were swinging him and dropped him on his head on the cement porch. Applicant had a big knot on his head. He was taken to the Druid City Hospital where he was X-rayed and diagnosed with a concussion. Applicant was then sent home. Applicant started having headaches, at least 2 or 3 a week for some months after that but Joe Mae did not take him to see a doctor for his headaches.

When Applicant was 13, he had a high fever. Joe Mae did not take him to the hospital and the fever eventually passed.

During interviews with other family members, I was informed that Joe Mae had a drinking problem throughout much of Applicant's life and drank during her pregnancy with Applicant. I interviewed Joe Mae a second time at which time I confronted her with the information I learned. Joe Mae finally admitted that she drank during pregnancy. She would often drink "boot leg" alcohol produced by her sisters in their home. She did not remember the exact

amount but estimated she drank at least "a pint." One every Friday, Saturday, and Sunday night. I obtained an affidavit from her regarding her alcohol consumption during her pregnancy with Applicant. I was unable at this point, however, to determine with more particularity the amount or frequency of her alcohol consumption. I was unable due to lack of time to contact any of Joe Mae's sisters to corroborate or further investigate these facts. The facts of Joe Mae's drinking during pregnancy was not presented at trial and Joe Mae did not admit to Saum that she drank during her pregnancy with Applicant. Along with the drinking was unusual behavior once Joe Mae was drunk and the effect that had on the children. One of her behaviors was waking the children at 2 or 3 in the morning and making them say the Lords Prayer over and over again until morning. On the second interview she admitted doing this.

From my investigation and research in other cases, I know that the consumption of alcohol may result in fetal developmental disorders and/or organic brain damage called "Fetal Alcohol Syndrome"(FAS), or a more mild form called "Fetal Alcohol Effect" (FAE). It is my understanding that FAE, although not as severe as FAS, it may manifest itself through behavior and judgment. From my review of the records in this case, I do not believe that Applicant has psychologically tested to determine the existence of brain damage/FAS/FAE. It is also my belief that a more developed investigation, particularly regarding Joe Mae's alcohol consumption could provide a factual basis to request the expert assistance of an neuro-psychologist or other psychological expert to determine the existence of FAS/FAE in Applicant.

If Applicant does suffer from FAS/FAE then this evidence of organic brain damage, which can manifest itself through a person's behavior and judgment, would have existed before and during the time of Applicant's trial and, if investigated, could have been presented in mitigation at trial.

B.

Serisa Brown

I contacted Applicant's sister, Serisa Brown (hereinafter "Serisa"), to discuss her testimony at trial, her statements to the police, and to determine the existence of any mitigation evidence which existed at the time of trial but was not presented.

5

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

Serisa testified at trial and gave two written statements, one to the police in Tuscaloosa and one to the police in Houston. During her interrogation in Houston, the police were verbally abusive and made various threats. She was threatened with "jail time" unless she "got it right". The police also threatened to take away her child unless she gave a statement detailing what they wanted. The police also threatened her with prosecution for drug trafficking. As a result of the threats and verbal abuse, Serisa, finally acquiesced and agreed to a statement prepared by the police giving the facts that they wanted. She informed me that the police basically asked her questions and she replied in order to get them to leave her alone. She stated that most of what she agreed to in the statement was false.

Serisa also informed me that hers and Applicant's mother, Joe Mae Brown, would drink alcohol on a daily basis. Often she would go out at night to drink and come back late in the evening or early the next morning. When she returned she would wake the children up and make them pray the rest of the evening until morning. The children would be so tired the next day that they would sleep in school.

The investigation is not complete with regard to Serisa. At the time of our interview, I did not determine at this time whether Serisa discussed with members of the Harris County District Attorney's Office prior to trial any false statements in her written statement to the Houston Police Department. I was unable to review her testimony at trial in depth because I did not have a copy of that testimony. This will be necessary as part of a complete investigation. It is also necessary to discuss with Serisa conflicting statements made by her sister, Carolyn Momoh, in her written statement which was entered into evidence at trial, as well as Carolyn Momoh's trial testimony. Further, it will be necessary to discuss with her any statements made by Carolyn Momoh to Serisa, her sister Grace, or their friend Kirk Royster after their interrogation by the Houston Police Department.

C.

Grace Brown

I contacted Applicant's half-sister, Grace Brown (hereinafter "Grace") to discuss her testimony at trial and determine the existence of any mitigation

6

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

: 00124

evidence which existed at the time of trial but was not presented.

Grace is older than Applicant and is Applicant's half-sister; she and Applicant have a different mother. Grace stated that Applicant's mother and father's divorce had a profound effect upon Applicant. Applicant was very close to his father and lacked a male role model when his parents divorced. Also the fact that dad left applicant in the hands of a drunk and abusive mother. After his parents divorce, Applicant also started to have behavior problems. Applicant has been suicidal on at least one occasion: Applicant at one point threatened to kill himself while in a bathroom at school. This happened after the divorce. In addition, after the divorce, Joe Mae's friends and family members would come around her house to gather and drink. Applicant's father disapproved of this crowd and would not let them come over when he and Applicant's mother were married. Once they were divorced the crowd of alcoholics surrounded applicant.

Applicant's mother (Joe Mae) had a drinking problem and was frequently drunk around Applicant. She would appear in public places in a drunken stupor, which would embarrass Applicant. Joe Mae's sister sold and continues to sell home made alcohol from her house and Joe Mae would often drink with her sister.

Applicant has a common-law wife named Onetha with whom he has three children. Applicant would work two jobs in order to provide for Onetha and the children. He wanted to make sure his children had more than he had. He knew how if felt to do without.

The Houston Police interrogated Grace along with her sisters Serisa Brown and Carolyn Momoh. The police were verbally abusive to her and her sisters. The police also threatened the sisters that they would be prosecuted if their statements did not match. During the interrogation, the police told her details from her sister Serisa's statement that they wanted her to corroborate. Her sister Serisa told her that the police threatened to take away her child unless she gave a statement giving the details that the police wanted. Serisa also told her that she signed her statement in order to get the police to leave her alone.

Grace spoke with Saum in Tuscaloosa prior to trial. Saum did not ask her about Applicant's childhood or personal background.

7

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

The investigation is not complete with regard to Grace. After consultation with Applicant's counsel, it will be necessary to discuss with Grace certain inculpatory statements, which Applicant allegedly made to their sister, Carolyn Momoh, in her presence.

### D.

### Carolyn Momoh

I contacted Applicant's half-sister, Carolyn Momoh (hereinafter "Carolyn") to discuss her testimony at trial and determine the existence of any mitigation evidence which existed at the time of trial but was not presented.

Carolyn is a half-sister to Applicant and a full sister to Grace Brown. Their father was married to their mother before he was married to Joe Mae Brown.

Applicant had a poor environment when he was growing up. Applicant lived with Joe Mae and two brothers and one sister in an small apartment in a poor part of town, about 10 yards from the rail road tracks. (I have observed the location of the apartment and the neighborhood.) There were a lot of drugs and violence in the neighborhood; it was not a good place to raise children.

Applicant had a common-law wife named Onetha with whom he had three children. Onetha was very materialistic and was always nagging Applicant to buy her things. At one point, Applicant was working two jobs to provide for his family. Applicant made many statements to her that he worked so hard because he wanted his kids to have more than his parents provided. As a result of his parent's divorce and lack of financial support from his father, Arthur Brown, Sr., Applicant knew how difficult it was to grow up poor.

Carolyn made one statement in Tuscaloosa and one in Houston. She also testified at trial.

When giving her statement in Houston, the police were verbally abusive

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

8

and threatened her with going to jail and losing her children unless she cooperated. The police knew that she was in the process of divorcing her ex-husband and that her husband wanted custody of the children. The police used this to get her to cooperate. The police typed the statement and had it match Serisa Brown's statement. The police would not finish until Carolyn agreed to say what Serisa said.

Carolyn stated that she had problems with testifying according to her statement at trial. She initially refused to testify because certain factual allegations within the statement were not true. The statement was incorrect in that stated that she knew she was supposed to transport drugs from Houston to Tuscaloosa, that Applicant agreed to pay her $1000.00 to drive the van and that Applicant ever admitted he had killed six Mexicans. There was no mention of money, only when applicant came to the hotel in Tuscaloosa did she receive any money to travel home. The statement about the six Mexicans was something made up by the police. Carolyn understood that she was being required to testify as to the truth of these allegations in her written statement and refused to testify because the allegations in her statement were not true.

As a result of her initial refusal to testify, Carolyn was jailed for contempt. The trial court appointed her an attorney, George Parnham (hereinafter "Parnham") to represent Carolyn. Parnham told Carolyn that she would get out of jail if she would testify the way the prosecution wanted, but she refused. Parnham charged her $6,000 for her appeal, which was paid by her mother. She was released, but was jailed for contempt a second time for refusing to testify. After she was jailed a second time, her mother told her to do what the prosecutors wanted so she could get out of jail and take care of her children. Carolyn agreed and testified at trial according to her statement. When being questioned by Applicant's attorneys at trial, she also stated that various portions of her statement and testimony was incorrect. Parnham was not present in court while she was testifying.

After Applicant's trial, the District Attorney charged Carolyn with perjury for contradicting her statement. She hired Katherine Scardino to represent her and she received deferred adjudication.

In the course of discussing her testimony with Carolyn, I did not have the opportunity to review the exact testimony because I only had a summarization of the transcript, and not the exact testimony. I also did not

9

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

have a copy of her statement to the Houston Police Department. Carolyn was clear, however, that her written statement was false to the extent that it states that Applicant admitted "shooting six Mexicans", that drugs were ever mentioned, and that Applicant agreed a head of time to pay her $1000.00 to drive the van from Houston to Tuscaloosa.

The investigation is not complete with regard to Carolyn. After consultation with Applicant's counsel, it is necessary to interview Carolyn to determine whether and when she informed the District Attorney's Office that there were details of her statement, which were factually incorrect. It is necessary to interview her regarding any threats were made against her by the District Attorney's Office prior to trial. It is necessary to review with Carolyn her trial testimony. It will also be necessary to review her written statement regarding details provided to her by the interrogating officers in order to corroborate her statement with Serisa's, as well as any conversations she may have had with Serisa, Grace or Kirk Royster after her interrogation which would support her claims that the details of her statement/testimony are false and coerced.

### III.

After consultation with Applicant's counsel, I believe that further investigation on this case is required in both Tuscaloosa, Alabama, and in Houston, Texas. The following persons need to be investigated:

(1) <u>Carolyn Momoh</u>: Further investigation is necessary with Carolyn Momoh. Investigation must be done regarding the details of her statements to the police and any details of pressure and/or threats by the Harris County District Attorney's Office to testify according to her written statement. It is necessary to review with her both her trial testimony and details of her written statement. It is necessary to discuss details of her written statement making reference statements made by Applicant to her alone and to her in the presence of other people. It is necessary to discuss with her factual allegations regarding other people in her written statement. And it is necessary to discuss with her any statements she made to her sisters Grace and Serisa, and their friend Kirk Royster after their interrogation by the Houston Police Department on June 26, 1992 in order to corroborate her allegations of being coerced into making false

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

10

statements.

(2) <u>Serisa Brown</u>: Further investigation must also be done with regard to Serisa Brown. It is necessary to discuss her statements to the Houston Police Department and any pressure and/or threats against her to testify in accordance with her statement. It is necessary to discuss with her any details, which the Houston Police Department made her put into her statement. It is necessary to discuss details made in Carolyn Momoh's written statement about her and the alleged agreement with Applicant to drive the van. It is necessary to investigate any discussions or statement made by Carolyn Momoh to herself, Grace or Kirk Royster following their interrogation which corroborates Carolyn's claim that she was coerced into making false statements by members of the Houston Police.

(3) <u>Grace Brown</u>: Further investigation is necessary with Grace Brown regarding any alleged statements in Carolyn's statement that Applicant made inculpatory statements to her, as well as any discussions or statement made by Carolyn Momoh to herself, Serisa or Kirk Royster following their interrogation which corroborates Carolyn's claim that she was coerced into making false statements by members of the Houston Police

(4) <u>Joe Mae Brown</u>: Further investigation is necessary with Joe Mae Brown in order to develop evidence of her alcohol consumption during pregnancy which may form the basis to test Applicant for brain damage. It may be further necessary to contact Joe Mae's sisters and discuss their recollection of Joe Mae's alcohol consumption in general and her consumption during her pregnancy with Applicant.

(5) <u>Kirk Royster</u>: It will be necessary to locate and interview Kirk Royster, who was interrogated along with Grace and Serisa Brown, and Carolyn Momoh by the Houston Police Department on June 26, 1992. Mr. Royster may possess knowledge of any statements made by Carolyn Momoh following her interrogation by the police which corroborates her allegations that she was coerced into making false statements by the police. Mr. Royster's whereabouts are currently unknown to myself.

(6) <u>Monica Dotson</u>: It will be necessary to locate and interview Monica Dotson, who may possess exculpatory information relating to the presence of rival drug dealers in Houston at the time of the murders. At trial, Ms. Dotson

was identified as a source of one of the firearms, which was linked to the bullets taken from the decedents. Ms. Dotson's whereabouts are believed to be in the Tuscaloosa area.

(7) <u>Maliek Travis</u>: It will be necessary to interview Maliek Travis, who accompanied Applicant and his co-defendant's to Houston. Travis was a childhood friend of Applicant and may be able to provide both mitigation evidence as well as information relating to the offense. Travis is currently incarcerated in the Elmore Correctional Facility in Montgomery Alabama, approximately 2 ½ south of Tuscaloosa.

(8) <u>Juror Interviews</u>: As part of a complete investigation into non-record based claims, it will be necessary to contact a number of jurors from Applicant's trial to determine the possible existence of jury misconduct.

(9) Onetha Gay: Oneitha Gay is Applicant's girlfriend/common law wife and the mother of applicants children. She may have mitigation information, as well as knowledge of the co-defendants and other suspects in this case. She may also have knowledge of any family issues involving Applicant, as well as knowledge of any drug use by Applicant.

The foregoing grounds are only those grounds, which are known at this point. It is possible that tangential points may arise which require further investigation, but which cannot be detailed at this point.

Further, affiant sayeth not.

LISA MILSTEIN

SUBSCRIBED AND SWORN TO, before me on this, the ____ day of March 1998.

LISA MILSTEIN
Gerald Bierbaum

GERRY BIERBAUM
TARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
NOV. 8, 1999

AFFIDAVIT OF LISA MILSTEIN: EX PARTE ARTHUR BROWN, JR.

12

: 00130